here to hear your argument this morning, Mr. Toggett. Well, there are some, Your Honor. Mr. Toggett, could you speak with us, please? Thank you. May it please the Court, my name is Torin Toggett and I'm representing Richard and Loretta Jackson and their daughter E.D.J. as appellants in this appeal. Now, they asked this Court, in part, to reverse the District Court's granting of summary judgment on the issue of qualified immunity to Mr. Oates and to Mr. Kemp on the claim that they violated E.D.J.'s Fourth Amendment rights by searching her cell phone contrary to the standards set forth in concurring in the judgment in Lopez v. United States said, quote, the fantastic advances in the field of electronic communications constitute a greater danger to the privacy of the individual. Fifty-one years later, Chief Justice John Roberts stated in Riley v. California in 2014, modern cell phone are not just another technological convenience. Let's get to the heart of the matter. So when it comes to the cell phone, and our question is one of qualified immunity here. Yes, Your Honor. None of the cases you're citing involve school searches of cell phones. So, you know, you have a tough burden, as you know, to show that not only there was a constitutional violation, but that it was clearly established that every reasonable official would have been on notice about it. Yes, Your Honor. So there had been, as I understand it in this record, a threat of violence by a student against another. Correct? There was a threat of violence against my client, E.D.J. Yes, yes. And then, of course, the person who had allegedly made that threat reported that E.D.J. had been involved in some form of, I don't want to get bogged down in this, okay, but harassment, bullying, something like that. Making fun of, okay, right? Right. And school officials are trying to sort it out. Who's telling the truth? So they asked to look at her, and the making fun of, bullying, harassment, whatever you want to call it, had been by text message to other students, right? Your Honor, I think the record viewed most favorably to my client indicates it wasn't intimidation, it wasn't bullying, it was cell phone harassment. Getting bogged down into that, that I don't really want to get bogged down into. Making fun of, we'll just call it that. Making fun of, yes, Your Honor. Okay, you know, you did make the volleyball team. Yes. I mean, it's amazing to me what ends up in federal court these days, all right? And so that's what's reported. That's the other side of the story. They're trying to sort this out, figure out who's telling the truth. They look at her cell phone. Now, this is a smartphone, right? It's a cell phone, Your Honor. I don't know, smartphone, I think. Yeah, it's got text messages, but there's no indication that the school official looked at her phone calls. Just text messages. Right, not her emails. Correct. Not her Facebook. Correct. Not her tweets, not her photos, not her Instagram, Snapchat, all the things that look at and use on phones. The report had been that these had been text messages, and the search was confined to the text messages. And the school official, after looking at it, concludes the student had done nothing wrong and returns the phone, right? No, Your Honor. The text messages were reviewed to determine, allegedly by Mr. Oates to see whether or not had received any messages or that she had sent any messages to him by text, making fun of the other student. There was none ever found, of course. Right. And this was all based on rumor. And gave it back to the student, and the student was not reprimanded. But first, didn't they also review the text messages between your client and her mother and her grandmother, her ex-boyfriend? Correct. Correct. Well, can you tell me this? If I were looking at someone's text messages and I'm confining my search to the text messages, you'd have to look at all the text messages, wouldn't you, to figure out what's what? Your Honor, I respectfully disagree because the whole purpose of the search, allegedly, was to determine whether or not my client was making fun of this other student. So when they never searched anyone else's phone, they never even determined if there was such text messages. They just simply went to my client and said- I mean, but as I understood it, some of the text messages were sent to individuals who were not named, but were recorded in the telephone, in the cell phone, by some kind of emoji. Is that right? Well, my client, in some instances, used emojis to identify, let's say, her ex-boyfriend or a mother, her grandmother, her sister. But didn't she have Madre for her mother? Yes, correct. And so my understanding of the facts, and maybe I misunderstood, but I thought that the entire purpose of looking at her cell phone, which, by the way, I think was totally legitimate, was to check her texts to Bear, and only to Bear, because he was the only one that she was allegedly sending these bad-mouthing texts to. Correct. Did I misunderstand that? No, that's what the record shows. And also, I thought that it was indicated in the record that your client pointed out who Bear was, and it was also indicated by a Bear emoji. Yes, yes. Okay. And so after that was done, then, according to your client's version of events, which we have to accept, I mean, it's summary judgment, and so we're going to have to look at it in the light most favorable to your client. After that happened, that's when your client alleges that the rest of the texts were gone through. Correct. The ones to Madre, the one with the heart, and any number of other ones. The one to the grandmother, et cetera. Is that... Yes, Your Honor, and that's... But really, to the review of the other texts, which seem to be outside of the scope of the original search that was... And that's the whole point, Your Honor, under TLO. It exceeded the scope of the infraction that she allegedly had violated, and it went to extent that it was excessively intrusive into her mother, her sister, her grandparent, her ex-boyfriend, a girlfriend. These were not relevant at all to the basis of the search in the first place. It invaded her privacy, which was recognized under Riley of how sensitive the content of information in a cell phone is. I think that's what underscores all of this, is the privacy interest that the United States Supreme Court has said that that's what you look at, is you look at the nature of the privacy interest. And in here, I think it's a heightened interest that does not permit school officials to exceed the scope of what they're initially doing and the infraction, which was so incredibly minor. I mean, most of the cases that have been published in this area involve drugs. Everything about this is minor. Well, Your Honor, of course, I'm here, and I disagree, because I think it's a serious violation of one's rights to search a cell phone, particularly in such a way that invades one's privacy. And didn't—I'm sorry, I can't remember if it was—I think it was Mr. Kemp, maybe, who even said, if I had looked at discussions between family members, that obviously would have been a no-no. Right. And Mr. Oates was aware of TLO. He was aware that confidential and private information was on cell phones. And he far exceeded the scope of his search for an alleged infraction of teasing— It's a reasonable school official who's trying to sort out the she said, she said of a dispute between students, where there's been, allegedly, a threat of violence. Against my client, which was— Yes, yes, but we don't know yet whether that's true or not, right? But that's not what they were searching, Your Honor. The purpose— No, no, no, no, no, but the person who allegedly made the threat said, well, she did these things. And they're trying to sort out who's telling the truth. Could a reasonable school official not necessarily accept the student's assertion that the only thing there that would refer to Bayer and that's relevant to their determination of sorting out the veracity of these students? Your Honor, as Mr. Kemp testified, he was there and there wasn't even an expectation to search her cell phone. Mr. Oates decided to search the cell phone based on the conversation that Mr. Kemp had with my client, E.D.J., about whether or not she was sending text messages, making fun of this other student. That was the sole narrow purpose of the search by Mr. Oates. It had nothing to do with any alleged threat by this other student or any other matter. It was narrow just to this issue. So, yes, that— I mean, the context is that it arose where all of that is happening, right? I mean, the report of the threat, the report back that, oh, she's making fun of me for not making the volleyball team, all that's part of the context. It's an objective inquiry that the school official—my question is, could a reasonable school official, knowing everything, which is what an objective inquiry requires— at the text messages to sort this out? Who's telling the truth? Even for the sake of argument, Your Honor, there was justification for the search at its inception, for the sake of argument. The search—the second part of TLO, which does apply, I think, because TLO recognized the search of confidential and private information such as diaries, letters, things of that nature that are very private. So the cell phone, of course, is a very private instrument under the Fourth Amendment. It's an effect of the student— If there's one thing that I don't think a cell phone is to a high schooler these days, it's private. Well, I think—I disagree, Your Honor, because the Supreme Court under Riley— Did she have a code on it? I mean, did she have a PIN that she put in? Did she have a PIN that she needed to put in in order to— She needed to unlock it, yes. Right. Does that indicate that maybe she thought that it was personal and private to her? I—absolutely. I know my time's up, and the rest will be on a rebuttal. Thank you. Okay, thank you. Mr. Coleman. Thank you, Your Honor. May it please the Court, my name's Franklin Coleman, and I represent here this morning David McCurry, the appellees, David McCurry, Bo Oates, Josh Kemp, and Sandy Valese. As the Court's aware, this is a very expansive set of facts, and what Mr. Togut was able to get to was— All we're going to talk this morning about is the cell phone, unless one of my colleagues wants to talk about something else, because that's the only thing he talked about in the opening. If you want to bring in something else, then he'll get an opportunity to respond to other things, and you won't have any opportunity to respond to that. Well, Your Honor, I feel like in our best interest, in my client's best interest, is to just to get into the information about, or the argument about— Do whatever you like, and do it any way you like. All right. Of course, that may mean that he'll get to say things you don't have an opportunity to respond to, and we do have your briefs. Okay, that'll be all right. And the reason I say this is that there is, I believe, with this public forum area of the law and First Amendment, there is a learning curve, and there are some things that I probably don't have in that brief that may be important or may be of note to the Court. I assume you've read the briefs carefully, and so you probably are better first on it than me, but as far as this, as you know, after this happened, the cell phone, Mr. Jackson then, among other things, threatened to sue the school system or the school, and then he wanted to speak before the Board of Education, to which Mr. McCurry told him that he could not because he had threatened litigation. And in order to determine whether, of course, this is qualified immunity, so we are still talking about what's clearly established, but in order to determine whether that was constitutional or not, the District Court engaged in this forum analysis, which I won't get too far into at this point. Tell me this, was Mr. Oates entitled to look at that cell phone and the text messages? I believe so because he had reasonable suspicion based on the information he'd received from. Had reasonable suspicion of what? That there may be, I think the standard there is that there is a reasonable grounds standard, and is there a moderate chance of discovering some evidence of violation of school rules or the law? What would that be? What would the evidence be? Yeah, what would be the violation by EDJ? Right. The system had, and they're in the record, they had policies against bullying, harassment, also disrespectful behavior towards other students. And I think he testified that it could have been one of those. He even said, there was some argument, I think, in the briefs about that it couldn't be classified as harassment because the boards or the school's policy on harassment required that there be an element of race, national origin, gender, or religion. And Mr. Oates' actual testimony was that he thought she could be involved in bullying, harassment, or something. So, I mean, just speaking for myself, and I can't speak for anybody else, but just based on the questions that I've heard from my brother here, Judge Pryor, I don't think anybody takes issue, and surely feel free to correct me, with the idea that the search was reasonable in the first instance. I certainly don't. My concern comes... Togan does. My concern comes from the expansion of the search beyond the texts with Bayer. I also want to bring up one other question that I'd like you to address before the end of this, which is on a different subject. So I have two, those are sort of two areas. The other one goes only to Ms. Valese, and it's with respect to the removal of Mr. Jackson from the game. My concern is that, and I don't know the answer to this, but whether the mistake that Ms. Valese made was a reasonable one, was objectively reasonable. Was it a reason, and was it a mistake of fact, or was it a mistake of law? I mean, it seems to me that it was perhaps a mistake of law, because the letter stated that Mr. Jackson could be arrested for criminal trespass if he failed to comply with the letter's rules under the Georgia Code. And so, so it seems to me then that if he was complying with the code, and he was complying with that requirement, and he was removed anyway, that that was perhaps a mistake of law on the part of Ms. Valese, because he hadn't actually trespassed, but he was being removed. I don't know whether you want to address that. Yes, ma'am. First, I'll point out that the letter that was in question was written in August, and this happened in October. Also, if you read the letter, which I know you have, it doesn't address until the second page that he can be present at volleyball games. I understand how it happened, and I completely understand that administrators have a lot on their minds, and a lot more than knowing the ins and outs of the specific details of letters that may have been written to parents. However, this one did threaten criminal action if Mr. Jackson engaged in certain activities, and this also did happen to be EDJ's senior night, so it's not just sort of a run-of-the-mill kind of game. Correct. So I think what we have to do is we have to determine whether legally, right, there's a problem here, or whether it can be excused legally, and that's what I'm asking you for help with, not factually why this happened, but legally. I'm going to point out additionally that the Georgia Code, in OCGA 20-2-1180, that gives some parameters as to when a person can be barred from or removed from school grounds, and, you know, there is some specifics in there about if the individual has committed criminal trespass, etc., but then in subsection F of that code section, it says nothing in this code section shall be construed to prohibit school administrators from prohibiting the admission of any person who has violated school policy or state law. Again, I don't have a problem with his having been prohibited from going to school. That's not where my question is. My question is, having prohibited him from attending school functions, right, in this letter, but having also made clear that he could attend certain school functions under certain rules, but when he was following those rules, he was then removed, what is the legal analysis we should apply if your client is correct that there's not a violation here? Because it seems to me like it's a mistake of law, and then if it is a mistake of law, it becomes, is it an objectively reasonable mistake of law? And that's where my concern lies, that it may not be. I feel like that, what I was, the section that I was just quoting, I don't think there's any case law or other authority out there that's going to establish that this letter they gave him necessarily creates. You can help me with the record on this, okay? Okay. Which officials are defendants who are being sued and to be held responsible for participating in his removal from the premises? I think all of them are in this case. In that instance, it would be. In that instance, it would be who? McCurry, except for Oates. It would be McCurry, Kemp, Valise, and Mr. Waymire's client, Smith. Okay. Who wrote the letter? McCurry. Okay. Is there any evidence that anyone other than McCurry knew the contents of the letter, was privy to the contents of the letter before the official was removed, before the parent was removed? They had, Ms. Valise would have had a copy of it. I believe that's reflected in the record in the deposition. And she also indicated she had reviewed it previously, but Kemp and Smith did not. And I think we can just, for me personally, I don't think Kemp and Smith have any liability here. My question concerns Valise. Right. She had read it and what she indicated was, and I think she very forthright in her deposition that she forgot that it was there. But I also am not certain that... Okay. All right. So she had read it. She says she forgot. About that. When the event occurs, she's consulted about his removal. Is that right? That's correct. Is the writer of the letter consulted? By telephone. He lives in another, quite a ways away. He stays in Casita during the week and then goes home on the weekends. And he confirms to Valise, right, that he shouldn't be there. The parents shouldn't be there. He said he was going to leave it up to you. And he even also testified that he maybe misunderstood and thought that there was another incident that took place. But what I was going to point out is that I'm not, you know, I don't know of anything that would show that this letter necessarily creates the right to be there. And that I'm not given that OCGA 20-21180F, subsection F. I think that the law would allow Ms. Valise to, even if Mr. McCurry had said you can be there under these circumstances, to determine later on that he shouldn't be there. What would that determination be based on? She said that she kept rethinking about what happened with the coaches and how concerned the coaches were. And she said that several times in her deposition. I just kept thinking about those coaches. And so perhaps, you know, if she, if nothing else, it would be reasonable for her to decide at a later time he's not supposed to be here or he shouldn't be here because he's making these coaches nervous. And by the way, she did also testify that it was after the ceremony for senior night had taken place. And there's perhaps factual dispute about that. But there's no dispute that her belief was it was after that had finished. And I see that my time's up. Well, do you have any other questions? No. Do you have any other? Just one quick question. The school board, does it meet on the school campus or somewhere else? Uh, it's at the administration building, I believe, which is a, I mean, it's, it's a, I believe it is a former school that they now use as an administration building. So it is school proper. Not at the middle school, high school. It is not in the middle school, high school. Anything else that you wanted to get to that you didn't have an opportunity? Well, I was going to talk about the, uh, the one thing that I thought was stood out as far as the breeze, is the difference between designated public forum and limited public forum. We'll figure that out. Okay. Thank you. Thank you, Mr. Coleman. Mr. Wehmeyer. Good morning. May it please the court. I'm Jason Wehmeyer here on behalf of Deputy Ryan Smith. And from the court's comments so far, I take it that there is very little debate about, uh, Deputy Smith and whether summary judgment should be affirmed. So I'm primarily here to answer the court's questions. I have some remarks, but I certainly don't want to waste your time. Okay. Thank you, Mr. Wehmeyer. Thank you. Have a good day. Thank you. Favorite lawyer of the morning. Mr. Togut. Three minutes. Uh, on the issue of the search and seizure on senior night. So for the record, the record shows that Officer Smith went over to Mr. Kemp and said, I don't think he should be there. That's when Mr. Kemp called up Ms. Feliz and said, what should I do? She called up Mr. McCurry. Mr. Superintendent McCurry said, I leave it to you. At that time, he didn't remember. He said he forgot about the letter that he had read, giving my client, Mr. Jackson, the opportunity to attend his daughter's volleyball game. Ms. Feliz testified that she had also forgotten about the contents on it, of it. Yes. And, and so this is what I think is very important, Your Honor. So after, um, and Ms. Feliz said to, directed to Mr. Kemp, don't remove Mr. Jackson until the end of senior night and don't create a scene. That's not what happened. That's exactly the opposite. They went over, the games were still going on. That's when Mr. Jackson was removed. Almost immediately after he was removed from the high school, that's when Kemp again called up Ms. Feliz and said, by the way, Mr. Jackson said there's a letter saying I can be here. And that's when Mr. Kemp called up Ms. Feliz and said, oh, go to my office and look at the letter again. And that's when she realized after the letter was read to her that she had made this gross mistake. And then Mr. McCurry, of course, had also admitted that I just forgot to tell Ms. Feliz that Mr. Jackson was allowed to be at the games. So I think that's very important facts in the record that show that this was not a justified objective based on probable cause to remove Mr. Jackson that he was trespassing on school property that evening because he was not. I have a very short time, but getting back to the, on the First Amendment issue with the school board, I'll just let the court read the briefs. And based, other than the case that Judge Rosenbaum, of course, wrote in Barrett versus Walker that I rely on the contents of those principles apply to this case. But in regard to the search, I asked the court to look particularly at Safford Unified School District. And because that case by the Supreme Court, I think, is important in that the court recognized there are different levels of search based on TLO that initially you may search a backpack or something like that and based on reasonable suspicion. But when you go beyond that, as in Stafford, which was a strip search case, searching the undergarments of students, that that's where there's a heightened privacy interest. And I'm just going to submit to the court, that's the same thing I'm trying to argue in this case, that searching the cell phone beyond the scope. Thank you, Mr. Tokut. We have your case. Thank you. The court is adjourned for the week.